**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| (1) LESLIE HANNAN, an Individual; | |
| Plaintiff, | |
| v. | |
| (1) CITY OF TULSA, a Municipal Corporation; | Case No. 25-cv-00298-MTS |
| (2) WENDELL FRANKLIN, in his Individual Capacity as former Chief of the Tulsa Police Department; | |
| (3) JAKE HUFF, | |
| (4) MADELYN SWEGER, | ATTORNEY LIEN CLAIMED |
| (5) DENZIL AUSTIN BERRYMAN, | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

**COMES NOW** Plaintiff Leslie Hannan, by and through her attorneys of record, SMOLEN LAW | PLLC, and for her causes of action against the Defendants City of Tulsa, Oklahoma, Jake Huff, Madelyn Sweger, Wendell Franklin, and Denzil Austin Berryman, sets forth and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Leslie Hannan is currently a resident of Denver, Colorado; however, during the relevant timeframe, Hannan was a resident of Tulsa County, Oklahoma.

2. Defendant City of Tulsa, Oklahoma ("City") is a municipality and political subdivision, located in Tulsa County, State of Oklahoma, and incorporated under the laws of the State of Oklahoma. Defendant City is authorized, pursuant to Oklahoma statutory law and the

1

charter of the City of Tulsa, to establish, maintain, and supervise the operations of the Tulsa Police Department ("TPD").

3.      Defendant Wendell Franklin ("Chief Franklin") is a resident of Tulsa County and the former Chief of Police for the TPD. As TPD Chief of Police, Chief Franklin was responsible for creating, adopting, approving, ratifying, and enforcing the policies, practices, procedures, and/or customs of the TPD, including officer supervision, response protocols for domestic violence, body-worn camera usage, and victim protection. At all times herein, Chief Franklin acted under color of state law and within the scope of his employment with the TPD. Chief Franklin is being sued solely in his individual capacity, based on his supervisory role within the TPD.

4.      Defendant Jake Huff ("Officer Huff") was, at all relevant times, a resident of Tulsa County and a police officer employed by the TPD. At all pertinent times, Officer Huff acted within the scope of his employment and under the color of State law. Officer Huff is sued in his individual capacity for his personal involvement and participation in violating Plaintiff's rights, as set forth herein.

5.      Defendant Madelyn Sweger ("Officer Sweger") was, at all relevant times, a resident of Tulsa County and a police officer employed by the TPD. At all pertinent times, Officer Sweger was acting within the scope of his employment and under color of State law. Officer Sweger is sued in her individual capacity for her personal involvement and participation in the violation of Plaintiff's rights, as set forth herein.

6.      Defendant Denzil Austin Berryman was a resident of Tulsa County at all relevant times to this lawsuit.

7.      This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1343 to protect and redress deprivations of rights secured by the Fourth and/or Fourteenth Amendments to the United

States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivations of rights under the color of law.

8.  This Court's jurisdiction is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside within this Court's judicial district and a substantial part of the acts and/or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

10.  Paragraphs 1-9 are incorporated herein by reference.

### PLAINTIFF'S AVOIDABLE RAPE

11.  Plaintiff began dating Mr. Berryman in the late summer of 2022 and ended the relationship in the spring of 2023, when she became romantically involved with Matthew Dunn.

12.  In or around May of 2023, Plaintiff and Mr. Berryman reconnected, and in June of that year, the two became romantically involved again.

13.  On the night of June 19, 2023, Mr. Berryman came over to Plaintiff's apartment.

14.  Shortly after arriving, Berryman became enraged after seeing some gummy bear candies that he believed had been given to Plaintiff by Matthew Dunn.

15.  In response, Berryman screamed at Plaintiff, slapped her, shoved the gummy bears down her throat, and threatened to throw Plaintiff's cat off her balcony.

16.  In his rage, Berryman also punched a hole in the door to Plaintiff's apartment.

17.  Plaintiff immediately called 911 for her safety, requesting that Berryman be removed from her apartment.

18.     TPD Officers Huff and Sweger responded to Plaintiff's apartment after her call and arrived at approximately 1:45 a.m.[1]

19.     While TPD policy requires officers to activate their body-worn cameras during an investigation, both Huff and Sweger failed to activate their cameras at the beginning of the call.[2]

20.     Plaintiff, who had visible injuries, informed the officers that Berryman had physically assaulted her and that she wanted Berryman to leave her apartment.

21.     Berryman told the officers he did not have a car and would not leave the apartment until Plaintiff returned his cell phone, which Berryman erroneously claimed Plaintiff had taken.

22.     Despite neither having the cellphone nor knowing its location, Huff and Sweger directed Hannan to return to her upstairs apartment to retrieve Berryman's phone.  Neither Huff nor Sweger accompanied Hannan; both stayed outside with Berryman.

23.     While Plaintiff was searching her apartment for Berryman's cell phone, Berryman found his cell phone in his backpack.

---

[1] Huff and Sweger were in a romantic relationship with one another. TPD Departmental Order 2024-02 states that "[a]ll Officers and employees of the Tulsa Police Department shall adhere to City of  Tulsa Personnel Policy and Procedure 106, which prohibits nepotism, 'the hiring or influencing the terms of employment of an immediate family member,' and fraternization, 'a romantic or sexual relationship between a supervisor and subordinate.'" In this respect, City of Tulsa, Personnel Policies and Procedures, Section 106.37 states that "[f]raternizing is allowed between coworkers (i.e., no supervisory relationship exists), whether in the same or different departments, unless it results in a conflict of interest where the employees have substantial interaction with each other in their work duties, or it disrupts City business, in which case the employees involved are subject to §106.36, where the employee with the lesser seniority is subject to dismissal if the conflict is not resolved within the timeframe."

[2] In particular, TPD Policy #113B ("MVRS Policy"), advises that "TPD personnel are required to record all activity while executing Police Service as defined in this policy. Recording shall not be stopped until the conclusion of the event requiring MVRS activation or until authorized by a supervisor. TPD personnel involved in custodial transport shall continue recording until they are no longer in the presence of the person being transported. Intermittent recording of police service is prohibited.

24.    Because she was unaccompanied by an officer, Plaintiff was unaware that Berryman had located his cellphone in his backpack. Believing that Plaintiff continued to search her apartment for his cell phone so that he would leave.

25.    While Plaintiff continued looking for Berryman's cellphone, Huff and Sweger left Plaintiff's apartment building without arresting Berryman, requiring (or even advising) him to leave the premises.

26.    After searching for approximately 10-15 minutes, Plaintiff returned downstairs to tell the officers she could not find Berryman's cellphone. She was shocked to discover that the officers had left the scene, with Berryman still there.

27.    As Plaintiff was terrified of Berryman and believed she had no means of preventing Berryman from entering her property (particularly since TPD had abandoned the scene), Berryman re-entered Hannan's apartment.

28.    Once back in her apartment, Berryman immediately became enraged that Plaintiff had called the police on him.

29.    Berryman forced Plaintiff into her bed, where he forcibly removed her clothes and held her legs down. During this time, Plaintiff was crying hysterically and yelling "no."

30.    With Plaintiff on her back, Berryman began biting her and attempted to perform oral sex on her forcibly. Plaintiff repeatedly kicked at Berryman and pleaded with him to stop.

31.    In response, Berryman placed his hands around Plaintiff's throat and choked her until she lost consciousness.

32.    Once unconscious, Berryman forcibly raped Plaintiff, before falling asleep.

33.    The next morning, Plaintiff woke Berryman up and begged him to leave by saying she would drive him home.

34.    As Plaintiff and Mr. Berryman were leaving the apartment at approximately 7:00 a.m., Berryman verbally abused Plaintiff, which was witnessed by one of Plaintiff's neighbors.

35.    When Berryman saw that the neighbor was observing his actions, he left, and the Plaintiff fled to the safety of her apartment.

36.    Once back in her apartment, Plaintiff called a friend and explained what Berryman had done to her the night before.

37.    The friend found a hotline for victims of sexual assault to speak with a Sexual Assault Nurse Examiner ("SANE") and initiated a three-way call. During the call, Plaintiff had to text her friend the answers to the nurse's questions because her throat hurt too much to speak.

38.    The nurse encouraged Plaintiff to go to the hospital for fear of possible oxygen deprivation from the strangulation.

39.    Later that same day, Plaintiff went with a coworker to St. John's to have a medical evaluation done but was encouraged to have a "rape kit" done at another facility.

40.    On June 21, 2023, the next day, Plaintiff went to the Family Safety Center and had a SANE exam performed.[3]

41.    Plaintiff made another police report, resulting in criminal charges against Berryman. *See United States of America v. Denzil Austin Berryman*, United States District Court for the Northern District of Oklahoma, Case No. 23-CR-364-SHE.

42.    On January 8, 2025, following a jury trial, Berryman was convicted of aggravated sexual assault and assault of an intimate partner by strangulation.  As of the filing of this Complaint, Berryman has not been sentenced on these convictions.

---

[3] The Family Safety Center also assisted Hannan in obtaining a permanent protective order against Berryman, *Leslie Lane Hanna[n] v. Denzil Austin Berryman*, PO-2023-2012 (Tulsa County, Oklahoma).

43.    In the months following her rape, TPD's Internal Affairs Unit ("IA") began asking Plaintiff questions regarding the handling of her case.

44.    Because of the IA investigation, Plaintiff was advised that she may not be safe in Tulsa County. Subsequently, Plaintiff has relocated outside the State of Oklahoma.

### TPD'S INVESTIGATIVE FAILURES

45.    The danger faced by Plaintiff was entirely foreseeable and preventable.

46.    For starters, TPD and Chief Franklin continued to allow Huff to regularly patrol, despite regular, repeated and egregious violations of TPD's body-worn camera policy(ies).

47.    Furthermore, TPD and Chief Franklin allowed Huff and Sweger to patrol together, in clear violation of the City of Tulsa's and, by proxy, TPD's fraternization policy(ies).

48.    Upon information and belief to be confirmed in discovery, this was not the first time Officer Huff failed to use his body-worn camera, as he had multiple documented incidents of failing to do so.

49.    By way of example, TPD policy provides that "[o]fficers are required by state law to provide the victim with a Victim's Rights Card. Officers shall ask the Domestic Violence Lethality Assessment questions of the victim and record their responses on the Lethality Assessment Form to be turned in with the Incident Report." TPD Policy #120A ("Domestic Violence Policy") at (A)(7)(d).

50.    As TPD's Chief of Police during the timeframes relevant to this litigation, Chief Franklin was responsible for enforcing TPD policies, including the MVRS and Domestic Violence Policies, as well as statutory reporting obligations.

51.    However, neither Huff nor Sweger gave Hannan a Victim's Rights Card or conducted a Lethality Assessment.

52.    The Domestic Violence Police further states that "Officers will complete an Incident Report utilizing the *Domestic Violence Supplemental/Interview* in addition to a *Suspect Supplemental* regardless of whether the suspect is placed under arrest." Domestic Violence Policy at (A)(7)(c).[4]

53.    However, neither Huff nor Sweger created an incident report or documented record relative to the events between Hannan and Berryman on June 19, 2023.

54.    Moreover, as referenced above, both Huff and Sweger violated TPD's MVRS Policy by failing to activate their body-worn cameras in a timely manner.

55.    While Sweger finally turned on her body-worn camera when Plaintiff was sent up to her apartment to search for Berryman's cell phone, Huff never turned on his body-worn camera while at Plaintiff's apartment.

56.    Franklin and/or the City failed to discipline, retrain, or correct Huff's systemic noncompliance with the MVRS Policy, which constitutes deliberate indifference to citizens' constitutional rights and contributed directly to Plaintiff's harm.

57.    TPD repeatedly informed Hannan that she never made a 9-1-1 call on June 19, 2023; however, the 9-1-1 call was entered into evidence for Berryman's federal criminal trial.

58.    TPD also told Hannan that all body-worn camera footage from the night of June 19, 2023, was "lost;" however, Sweger's body-worn camera footage was later produced and used as evidence in Berryman's federal trial.

---

[4] "It shall be the duty of every law enforcement agency to keep a record of *each reported incident* of domestic abuse . . ." 22 O.S. § 40.6 (emphasis added).

## TPD's Policy, Procedure, and Custom of Treating Victims of Domestic Violence

59.    Officer Huff and Officer Sweger's failure to adequately investigate Plaintiff's allegations was a result of the TPD's policy, practice, or custom of handling allegations made by female domestic violence victims, which was objectively different than reports of other crimes.

60.    The TPD, through its officers, intentionally and with reckless indifference, ignored, disregarded, and failed to investigate claims of sexual assault by women properly. Instead of handling reports of sexual assault crimes like reports of other crimes, the TPD treated the female complainants as not credible and instead protected their male assailants.

61.    The TPD's customs and practices permitted officers, such as Huff and Sweger, to engage in gender bias in handling domestic violence cases. The TPD provided no training, supervision or discipline concerning sexual assault cases, allowing untrained investigators to dismiss claims of assault as "he said, she said," or stereotype the female victim as promiscuous, or view the typical trauma responses to sexual assault – whether strong emotion or little emotion -- as evidence that the assault did not occur.

62.    The TPD's failure to lawfully investigate domestic violence allegations is evident through Officer Huff and Officer Sweger's blatant failure to follow the dictates of the Domestic Violence Policy.

63.    As TPD's Chief of Police during the timeframes relevant to this litigation, Chief Franklin was responsible for enforcing TPD policies, including the MVRS and Domestic Violence Policies, as well as statutory reporting obligations.

64.    Despite knowing that TPD officers were not following the Domestic Violence Policy or were not adequately trained on how to do so, Chief Franklin failed to take any action to correct those deficiencies.

65.     The City's failure to enforce the MVRS Policy, the Domestic Violence Policy, and statutory reporting duties was part of a widespread practice so permanent and well-settled that it constitutes TPD's official policy or custom, subjecting TPD and the City to *Monell* liability. *Monell v. Department of Social Services*, 43 U.S. 658 (1978).

66.     The failure of the TPD to take sexual assault cases seriously and conduct fair and thorough investigations has led, predictably, to poor statistics and a low level of protection for women in the community who have been sexually assaulted.

67.     For instance, from 2013 to 2017, the TPD received approximately 109,623 calls for domestic violence-related incidents. However, only 23,976 calls (approximately 22%) resulted in an official incident report being completed.

68.     Moreover, while citizen-generated calls for police response to domestic violence-related incidents remained stable during this same period, TPD responses to these calls decreased, and arrests for domestic violence declined by 40.9% during this same timeframe.

69.     In total, calls related to domestic violence were the third most frequent type of calls received by the TPD between 2013 and 2017, surpassed only by traffic stops and alarm calls. However, arrests for domestic violence accounted for only approximately four percent (4%) of all people arrested in Tulsa during that period.

70.     TPD's failure to adequately address sexual assault is due to a lack of adequate policies and officer training, as well as a reliance on longstanding customs and the embedded biases of police officers, their supervisors, and the TPD.

71.     Upon information and belief to be confirmed in discovery, neither Huff nor Sweger had any specialized or up-to-date training in conducting sexual assault investigations, interviewing sexual assault victims, or dealing with anyone who had suffered this type of trauma. In contrast,

most police departments have specialized units dedicated to sexual assault victims, as it is widely known that inadequate training can contribute to harmful practices and a misperception that victims lie about sexual assault.

72. Despite knowing of the training deficiencies, the City and/or Chief Franklin failed to discipline, retrain, or otherwise correct this systemic noncompliance with the Domestic Violence Policy and the statutory reporting obligations throughout TPD. This constitutes deliberate indifference to the constitutional rights of citizens, including Plaintiff, and contributes directly to the harm suffered by Plaintiff.

73. The constitutional violations that caused the injuries suffered by Bobbie flowed directly from: (1) the TPD's failure to provide proper and necessary training for their officers and detectives in the handling of sexual assault cases; (2) the TPD's failure to have adequate policies, practices and customs that would have required proper training and guidance for handling sexual assault cases; and (3) the failure to provide adequate supervision to deter detectives from conducting reckless, biased and grossly inadequate investigations aimed not at finding the truth but at protecting the perpetrator.

74. The aforementioned customs, practices, and policies were a direct and proximate cause of the injuries suffered by Plaintiff.

## **CAUSES OF ACTION**

**I.    VIOLATION OF EQUAL PROTECTION UNDER 42 U.S.C. § 1983**
**(AS TO HUFF, SWEGER, CITY, AND FRANKLIN)**

75. Paragraphs 1-74 are incorporated herein by reference.

76. Hannan had a right under the Fourteenth Amendment to the United States Constitution to Equal Protection under the law.

77.    The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." Denials of equal protection by a municipal entity or any other person acting under color of state law are actionable under 42 U.S.C. § 1983.

78.    As a woman, Plaintiff was a member of a suspect class and was unlawfully discriminated against because of her sex.

79.    In addition to being a member of a protected class, Plaintiff is also a member of a "class of one," in that she was subjected to unfair and unequal treatment based on her gender.

80.    Here, despite being similarly situated to other citizens who call for police service, Plaintiff was treated differently because she was an alleged victim of domestic violence.

### ALLEGATIONS APPLICABLE TO DEFENDANTS HUFF AND SWEGER

81.    Paragraphs 1-80 are incorporated herein by reference.

82.    Officer Huff and Officer Sweger treated Plaintiff differently under the law. They failed to take her report seriously or properly investigate it on account that she was a woman who had alleged she was sexually assaulted.

83.    Officer Huff and Officer Sweger's denial of equal protection can be seen through the following:

 a. Refusing to do a Lethality Assessment, in violation of the Domestic Violence Policy;

 b. Refusing to give Hannan a Victim's Rights Card, in violation of the Domestic Violence Policy;

 c. Directing Hannan to return to her apartment to look for Berryman's cellphone, unaccompanied;

 d. Closing the domestic violence investigation, while Hannan was not present;

e.  Informing Berryman, either overtly or constructively, that he was allowed to remain at Hannan's apartment building, despite clear evidence of domestic violence;

f.  Refusing to create an Incident Report in violation of the Domestic Rights Policy; and,

g.  Not utilizing their body-worn cameras in violation of the MVRS Policy;

84.    There was no rational basis for Huff and Sweger to take these actions.

85.    Plaintiff was similarly situated to other citizens who call for police service; however, she was treated differently because she was an alleged victim of domestic violence.

86.    Huff and Sweger were deliberately indifferent to Hannan's health and safety in performing their duties.

87.    Huff and Sweger's indifference and conduct were wanton, willful, and reckless disregard and neglect of Plaintiff's rights, safety, and well-being, justifying the imposition of punitive damages.

88.    As a direct and proximate result of Huff's and Sweger's actions and failures to act, Hannan was raped by Berryman and suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00).

### ALLEGATIONS APPLICABLE TO THE CITY (MONELL LIABILITY)

89.    Paragraphs 1-88 are incorporated herein by reference.

90.    The City is charged with implementing and developing the TPD's policies regarding law enforcement intervention into allegations of domestic violence. It trains and supervises TPD officers, including Officer Huff and Officer Sweger.

91.    The Fourteenth Amendment requires TPD to adhere to the principles of due process and equal protection.

92.     As a victim of domestic violence and, subsequently, sexual assault, TPD had an affirmative duty to treat Hannan equally to any other victim of a crime in Tulsa.

93.     The aforementioned acts and/or omissions of Officer Huff and Officer Sweger in being deliberately indifferent to Plaintiff's constitutional rights, and violating Plaintiff's civil rights, were the direct and proximate result of customs, practices, and policies that the City promulgated, created, implemented, and/or was responsible for.

94.     Such policies, customs, and/or practices include, but are not limited to:

a.     The failure to promulgate and implement adequate and appropriate domestic violence police practices;

b.     The pattern and practice of allowing deprioritization of domestic violence victimization;

c.     The pattern and practice of allowing violations of body-worn camera mandates;

d.     The failure to promulgate and implement adequate and appropriate non-fraternization practices;

e.     The failure to train TPD officers, including Huff and Sweger, regarding the equal protection of domestic violence victims; and

f.     The failure to take adequate corrective measures, such as disciplinary action, to address known violations of City and TPD policies, such as domestic violence procedures, MVRS mandates, and incident reporting requirements.

95.     Moreover, the City, TPD, and Chief Franklin did not provide any, or provided inadequate, training and supervision to TPD officers concerning their obligation to thoroughly investigate reports of domestic violence, including their legal duty to perform a Lethality Assessment any time domestic violence is alleged.

96.     As a result, sexual assault allegations were left to be investigated by TPD personnel who were incapable of examining and addressing sexual assault allegations.

97.     In fact, upon information and belief, the TPD – unlike most medium and large-sized police departments - lacked a specialized unit to address sexual assault allegations.

98.     The aforementioned policies resulted in a custom and practice within the TPD whereby sexual assaults committed against women and girls were not investigated or remediated.

99.     The City and/or the TPD's systematic disregard of sexual assault victims cannot plausibly be explained as merely the uneven allocation of police resources, as the impact of that conduct exclusively harmed women and girls. Instead, the City and/or the TPD's approach to sexual assault allegations must be construed as the selective, intentional withdrawal of police protection for sexual assault victims based on their sex.

100.     In sum, the TPD violated Plaintiff's right to equal protection and breached its affirmative duty to Plaintiff when it failed to provide her with the same or similar level of police intervention as it provides to other victims of crimes in Tulsa, because she was a victim of domestic violence.

101.     The City knew (either through actual or constructive knowledge), or it was apparent, that these policies, practices, and/or customs posed substantial risks to the health and safety of domestic violence victims, such as Plaintiff.

102.     Nevertheless, the City failed to take reasonable steps to alleviate those risks in deliberate indifference to domestic violence victims' health and safety.

103.     The City tacitly approved of TPD's unconstitutional conduct by failing to act, amounting to an official policy of inaction. The City had ample notice and knowledge of this likelihood and the existence of a continuing pattern of abuse and unconstitutional behavior.

104. In this manner, the City knowingly, with deliberate indifference and conscious disregard, created and/or increased the risk of the danger and affirmatively put Hannan in harm's way.

105. As a direct and proximate result of the City's actions and failures to act, Hannan was raped by Berryman and suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00).

### ALLEGATIONS APPLICABLE TO FRANKLIN (SUPERVISORY LIABILITY)

106. Paragraphs 1-105 are incorporated herein by reference.

107. In his supervisory role within TPD, Franklin was responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the TPD, including the policies, practices, procedures, and/or customs, which led to violations of Hannan's constitutional rights.

108. Such policies, customs, and/or practices include, but are not limited to:

a. The failure to promulgate and implement adequate and appropriate domestic violence police practices;

b. The pattern and practice of allowing deprioritization of domestic violence victimization;

c. The pattern and practice of allowing violations of body-worn camera mandates;

d. The failure to promulgate and implement adequate and appropriate non-fraternization practices;

e. The failure to train TPD officers, including Huff and Sweger, regarding the equal protection of domestic violence victims; and

f. The failure to take adequate corrective measures, such as disciplinary action, to address known violations of City and TPD policies, such as

domestic violence procedures, MVRS mandates, and incident reporting requirements.

109.    There is an affirmative link between the aforementioned violations of Hannan's constitutional rights and policies, practices, and/or customs (as alleged above) that Franklin was responsible for.

110.    These acts and/or omissions, which were deliberately indifferent to Hannan's health and safety and violated Hannan's civil rights, were the direct and proximate result of customs, practices, and policies that Franklin promulgated, created, implemented, and/or was responsible for as the TPD Chief of Police.

111.    The maintenance of the aforementioned policies, practices, and/or customs posed an excessive risk to the health and safety of Tulsa-area victims of domestic violence, including Hannan.

112.    Franklin disregarded the rights of equal protection afforded to victims of domestic violence in Tulsa.

113.    Franklin has been, and continues to be, deliberately indifferent to Tulsa domestic violence victims' health and safety.

114.    Chief Franklin's indifference and conduct were wanton, willful, and reckless disregard and neglect of Plaintiff's rights, safety, and well-being, justifying the imposition of punitive damages.

115.    As a direct and proximate result of Franklin's actions and failures to act, Hannan was raped by Berryman and suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00).

## II.    VIOLATION OF SUBSTANTIVE DUE PROCESS UNDER 42 U.S.C. § 1983
## (HUFF, SWEGER, CITY, AND FRANKLIN)

116.    Paragraphs 1-115 are incorporated herein by reference.

117.    Under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, the Defendants had a constitutional duty not to create a danger or increase Plaintiff's vulnerability to a danger of sexual violence.

118.    This duty was clearly established when the events gave rise to this action.

119.    Plaintiff was a member of a limited and specifically definable group – *i.e.*, a known victim of intimate partner violence who had just contacted police for assistance and whose risk profile was statutorily recognized under 21 O.S. § 142A-3.

120.    During their encounter with Plaintiff on June 19, 2023, Officer Huff and Officer Sweger were made aware that Berryman had physically abused Plaintiff.

121.    Despite possessing that knowledge, Officer Huff and Officer Sweger took several affirmative actions, which placed Plaintiff at an increased risk of being sexually victimized, including the following:

a.   Directing Hannan to look for Berryman's phone in her apartment, without police accompaniment;

b.   Informing Berryman, either overtly or constructively, that he was allowed to remain at Hannan's apartment building, despite clear evidence of domestic violence; and

c.   Closing their investigation without speaking with Plaintiff regarding her allegations.

122.    Officer Huff and Officer Sweger's actions, as described herein, created the danger or increased Plaintiff's vulnerability to the danger that Berryman would escalate his assaults.

123.    In particular, it was obvious that downplaying and failing to vet Plaintiff's allegation that she was being abused placed her at a serious and immediate risk of being abused further by Berryman.

124.    Nevertheless, Officer Huff and Officer Sweger refused to take further action, including conducting a Lethality Assessment or completing an incident report, leaving Plaintiff particularly vulnerable to Berryman.

125.    Officer Huff and Officer Sweger's affirmative actions in creating the danger to Plaintiff were the direct and proximate result of customs, practices, and policies promulgated, created, and implemented by the City and Franklin.

126.    Such policies, customs, and/or practices include, but are not limited to:

a.    The failure to promulgate and implement adequate and appropriate domestic violence police practices;

b.    The pattern and practice of allowing deprioritization of domestic violence victimization;

c.    The pattern and practice of allowing violations of body-worn camera mandates;

d.    The failure to promulgate and implement adequate and appropriate non-fraternization practices;

e.    The failure to train TPD officers, including Huff and Sweger, regarding the equal protection of domestic violence victims; and

f.    The failure to take adequate corrective measures, such as disciplinary action, to address known violations of City and TPD policies, such as domestic violence procedures, MVRS mandates, and incident reporting requirements.

127.    These customs, practices, and policies harmed Plaintiff and magnified her exposure to harm.

128.    As a result of these City/TPD's customs, practices, and policies, Berryman violently and repeatedly raped Hannan.

129.    Officer Huff, Officer Sweger, the City, and Franklin acted recklessly, disregarding the risks and dangers they created for Plaintiff.

130.    Officer Huff, Officer Sweger, the City, and Franklin were deliberately indifferent to the creation and increased the risk of danger to Tulsa-area victims of domestic violence, including Hannan.

131.    This conduct, when viewed as a whole, is conscience-shocking.

132.    Officer Huff, Officer Sweger, and Chief Franklin's indifference and conduct were wanton, willful, and in reckless disregard and neglect of Plaintiff's rights, safety, and well-being, justifying the imposition of punitive damages.

133.    As a direct and proximate result of these actions and failures to act, Plaintiff was raped by Berryman and suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages in excess of Seventy-Five Thousand Dollars ($75,000.00).

### III.    GROSS NEGLIGENCE
### (AS TO HUFF, SWEGER, AND FRANKLIN)

134.    Paragraphs 1-133 are incorporated herein by reference.

135.    Oklahoma law imposes a duty upon law enforcement to "keep a record of *each reported incident* of domestic abuse," and to assess the potential for danger by interviewing victims of domestic abuse before leaving the scene. 22 O.S. § 40.6 (emphasis added); 21 O.S. §142A-3.

136.    TPD's Domestic Violence Policy, similarly, requires Huff and Sweger to perform a Lethality Assessment and provide Hannan a Victim's Rights Card on domestic violence calls.

137.    Huff, Sweger, and Franklin additionally had a duty to uphold Hannan's constitutional rights of equal protection and due process, as described above.

138.    Huff and Sweger breached this duty in multiple ways, including failing to conduct a lethality assessment, properly interview Ms. Hannan about the incident, verify Ms. Hannan's safety before leaving the scene, and file a report of the incident.

139.    Huff and Sweger knew they were responding to an active and ongoing domestic violence call, knew the suspect remained on-site, and knew they were abandoning Hannan without protective action.

140.    The complete failure to engage in even the minimal safety protocols expected of responding officers created a foreseeable and immediate risk of physical harm, which materialized within minutes when Hannan was violently raped and strangled by Berryman, the very individual she had asked TPD to remove.

141.    Similarly, Franklin had a duty to all Tulsans to train and supervise all TPD officers in performing their duties, including the proper adherence to TPD policies, including the MVRS Policy, the Domestic Violence Policy, and the non-fraternization prohibition.

142.    Franklin breached this duty creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the TPD, which included non-compliance with multiple policies and procedures, such as the MVRS Policy, Domestic Violence Policy, and the non-fraternization prohibition, as well as a complete deprioritization of domestic violence throughout Tulsa.

143.    Huff's, Sweger's, and Franklin's actions were not the result of mere negligence or oversight. Defendants acted with a reckless disregard so severe as to constitute an entire want of slight care and diligence or an "intentional failure to perform a manifest duty in reckless disregard

of the consequences or callous indifference to the life, liberty, or property" of Hannan. *Kakkanatt v. Okla. Empl. Sec. Comm'n*, 183 P.3d 1032, 1036 n. 1 (Okla. Civ. App. 2008) (citing 25 O.S. § 6).

144.    The Defendants' conduct, as alleged herein, was wanton, willful, and in reckless disregard and neglect of Plaintiff's rights, safety, and well-being, justifying the imposition of punitive damages.

145.    As a direct and proximate result of these actions and failures to act, Hannan was raped by Berryman and suffered physical and emotional trauma, personal injury, mental pain and suffering, emotional distress, and other actual damages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

### IV.    SEXUAL BATTERY
### (AS TO BERRYMAN)

146.    Paragraphs 1-145 are incorporated herein by reference

147.    Berryman violently raped and strangled Hannan on June 19, 2023.

148.    Berryman's acts were nonconsensual.

149.    Berryman intended to make offensive contact with Hannan's person.

150.    Berryman's actions resulted in harmful contact with Hannan.

151.    Berryman has been convicted of this rape and strangulation in *United States of America v. Denzil Austin Berryman*, 23-CR-364-SEH.

152.    Berryman's conduct was wanton, willful, and in reckless disregard and neglect of Plaintiff's rights, safety, and well-being, justifying the imposition of punitive damages.

153.    As a direct and proximate result of Berryman's conduct, Hannan has suffered damages, including physical and emotional trauma, personal injury, mental pain and suffering,

emotional distress, and other actual damages, in excess of Seventy-Five Thousand Dollars ($75,000.00).

## V.    PUNITIVE DAMAGES
### (AS TO ALL DEFENDANTS)

154.    Paragraphs 1-153 are incorporated herein by reference.

155.    The intentional, wanton, and reckless conduct of Defendants in disregard of Hannan and others similarly situated was conducted with full knowledge in that Defendants knew, or should have known, of the severe adverse consequences of their actions.

156.    Defendants' actions constituted reckless disregard for Hannan's health and safety.

157.    The acts of Defendants were so wrongful, culpable, and egregious that punitive damages in a sum that exceeds $75,000.00 should be awarded against Defendants to set an example to others similarly situated that such inexcusable conduct will not be tolerated in our community.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including, but not limited to, damages for injuries to her person, physical pain, past, present and future emotional pain and suffering, ongoing mental anguish, and loss of past, present, and future enjoyment of life, in excess of Seventy-Five Thousand Dollars ($75,000.00), attorney's fees, punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), and all other relief deemed appropriate by this Court.

Respectfully submitted,

SMOLEN | LAW, PLLC

Donald E. Smolen, II, OBA #19944
Jack W. Warren, OBA #33635
Christopher U. Brecht, OBA #22500
611 S. Detroit Ave.
Tulsa, OK  74120
P: (918) 777-4LAW (4529)
F: (918) 890-4529
don@smolen.law
jack@smolen.law
chrisbrecht@smolen.law
*Attorneys for Plaintiff*